**No. 25-1523**

# In the United States Court of Appeals for the Sixth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

KARNAIL SINGH,
*Defendant-Appellant.*

*On Appeal from the United States District Court for the Eastern District of Michigan, No. 2:13-cr-20551, Hon. David M. Lawson*

## APPELLANT'S PETITION FOR REHEARING EN BANC

FIROOZ T. NAMEI
NAMEI & DALENCE LLC
  *15 East 8th Street*
  *Cincinnati, OH 45202*
  *(513) 721-0200*

LISA S. BLATT
  *Counsel of Record*
CHARLES L. MCCLOUD
ERIN M. SIELAFF
RHOCHELLE KRAWETZ
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue SW*
  *Washington, DC 20024*
  *(202) 434-5000*
  *lblatt@wc.com*

*Counsel for Defendant-Appellant Karnail Singh*

# TABLE OF CONTENTS

Page

RULE 40 STATEMENT ..................................................................................1

BACKGROUND...........................................................................................2

REASONS FOR GRANTING REHEARING ...................................................7

I.    The Panel Decision Expressly Splits with the En Banc Second Circuit and Conflicts with Supreme Court Precedent.............................7

II.    The Case Presents a Question of Exceptional Importance....................14

CONCLUSION...........................................................................................16

i

# TABLE OF AUTHORITIES

Page

## CASES

*Alexander v. State*, 772 S.E.2d 655 (Ga. 2015)................................................................8

*Bell v. Bell*, 512 F.3d 223 (6th Cir. 2008) (en banc) ............................................15

*Chaidez v. United States*, 568 U.S. 342 (2013)................................................13

*Farhane v. United States*, 121 F.4th 353 (2d Cir. 2024) (en banc)..........*passim*

*Fedorenko v. United States*, 449 U.S. 490 (1981)................................................14

*Klapprott v. United States*, 335 U.S. 601 (1949)................................................1, 15

*Knauer v. United States*, 328 U.S. 654 (1946) ................................................1

*Lafler v. Cooper*, 566 U.S. 156 (2012)................................................8

*Miller v. Straub*, 299 F.3d 570 (6th Cir. 2002)................................................8

*Padilla v. Kentucky*, 559 U.S. 356 (2010)................................................*passim*

*Schneiderman v. United States*, 320 U.S. 118 (1943)................................................14

*Strickland v. Washington*, 466 U.S. 668 (1984)................................7, 8, 9, 13

*United States v. Singh*, 2022 WL 2209369 (E.D. Mich. June 19, 2022)..............6

*United States v. Singh*, 95 F.4th 1028 (6th Cir. 2024) ................................................6

*United States v. White*, 551 F.3d 381 (6th Cir. 2008) (en banc)........................15

## CONSTITUTION, STATUTES, AND RULES

U.S. Const. amend. VI................................................*passim*

8 U.S.C.

    § 1227................................................5

    § 1229a................................................11

    § 1451................................................15

Fed. R. App. P. 40 ................................................7, 14

6th Cir. I.O.P. 40 ................................................14

## OTHER AUTHORITIES

Mem. from Sec'y John Kelly, Dep't of Homeland Sec., *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017) ................................................11

Ernesto Londoño & Hamed Aleaziz, *Justice Dept. Targets Hundreds of Citizens in New Push for Denaturalization*, N.Y. Times (Apr. 23, 2026) ................................................15

Mem. from Brett A. Shumate, Assistant Att'y Gen., *Civil Division Enforcement Priorities*, U.S. Dep't of Justice (June 11, 2025), https://tinyurl.com/4kbwpuc8................................................14

Page

Other Authorities—continued:

Holly Straut-Eppsteiner, *Naturalization: Policy Overview and Selected Trends*, Cong. Rsch. Serv. (Sept. 16, 2025), https://tinyurl.com/4m8h284z ........................................................................14

**RULE 40 STATEMENT**

The Supreme "Court has long recognized the plain fact that to deprive a person of his American citizenship is an extraordinarily severe penalty." *Klapprott v. United States*, 335 U.S. 601, 612 (1949) (opinion of Black, J.). For some, denaturalization "result[s] in the loss of all that makes life worth living." *Knauer v. United States*, 328 U.S. 654, 659 (1946) (citation omitted). The panel decision allows naturalized citizens to subject themselves to these "tremendously high stakes," *see id.*, without even knowing it. This trap for the unwary arises from the panel's holding that the Sixth Amendment does not obligate counsel to inform naturalized citizens that pleading guilty risks denaturalization. In this case, Karnail Singh's lawyer assured Singh that pleading guilty would *protect* his citizenship. Now, facing the very denaturalization proceedings he was told a guilty plea would avoid, Singh has no Sixth Amendment remedy in this circuit.

But if Singh lived in the Second Circuit, it would be a different story. Indeed, the panel's erroneous decision here expressly split with the en banc Second Circuit, which held that the Sixth Amendment does require counsel to warn their clients about the denaturalization risks attendant to a guilty plea. *Farhane v. United States*, 121 F.4th 353, 374 (2d Cir. 2024) (en banc). More

1

still, the panel's decision cannot be squared with the Supreme Court's decision in *Padilla v. Kentucky*, 559 U.S. 356 (2010) and its progeny, which obligate defense counsel to inform clients of the risk of deportation following a guilty plea. And even setting aside those conflicts, this case presents a constitutional question of exceptional importance, the answer to which has grave consequences for every naturalized citizen facing criminal charges. In fact, under the panel's approach, aliens now receive more robust Sixth Amendment protection than citizens—a perverse result that raises serious equal-protection concerns. *See Farhane*, 121 F.4th at 371. Under these circumstances, rehearing en banc is warranted.

## BACKGROUND

Karnail Singh was born and raised in India. Op. 2. Following the assassination of former Prime Minister Indira Gandhi in 1984, India experienced a surge in anti-Sikh violence. Motion to Amend Order, R.36, PAGEID#346. Singh, a Sikh, fled to the United States in 1991. Motion for Writ of Coram Nobis, R.25, PAGEID#146. He wanted to apply for asylum but could not speak or read English. *Id.* So Singh relied on members of a local Sikh temple to help him with the paperwork. *Id.* Singh's mentor at the temple filled out

2

the asylum application, purchased a birth certificate, and submitted the package of documents in 1991. *Id.* Unable to read English, Singh could not verify the accuracy of the replacement birth certificate or his asylum application. *Id.* When he received his work card several months later, Singh discovered that his name and birth date were incorrect. *Id.*

Hoping to make things right, Singh procured a copy of his birth certificate from his family back in India and retained an attorney to correct his initial asylum application. *Id.* Despite charging Singh over $16,000 and assuring him that his first application would be corrected, the lawyer (who later resigned his license while facing disciplinary charges and allegations of fraud) simply filed a new asylum application in 1994 without correcting the old one. *Id.* at PAGEID##146-47 & n.1; Ex. C, R.25-3, PAGEID##186-205 (retainer agreement and payment checks). The immigration judge scheduled a hearing on his first asylum application; Singh failed to appear at the hearing, so the immigration judge ordered him removed in 1995. *See* Order, R.34, PAGEID#325. Singh never received the deportation order. Motion to Amend Order, R.36, PAGEID#347. As far as Singh knew, his original application had been corrected and merged with his new application. *See* Motion for Writ of Coram Nobis, R.25, PAGEID##146-47.

While Singh's new asylum application was pending, he married a U.S. citizen. In 1996, Singh's wife filed a petition on his behalf and Singh concurrently "filed an adjustment to his second application" flagging the marriage and requesting lawful permanent resident status. Order, R.34, at PAGEID##325-26; *see* Motion to Amend Order, R.36, PAGEID#347. Singh also withdrew his pending asylum application. *See* Motion for Writ of Coram Nobis, R.25, PAGEID#147. Singh became a permanent resident in 2002 and a citizen in 2009. Order, R.34, PAGEID#326. Singh had been fingerprinted when he filed both asylum applications, when he was granted his green card, and when he filed his naturalization application. Motion for Writ of Coram Nobis, R.25, PAGEID#147. At no point did the deportation order come up, assuring Singh that all was right with his immigration status. *See id.*

Singh is a truck driver. On a return trip from Canada, Singh was flagged at the border; until then, Singh was not aware that he had been ordered deported. In August 2013, the government indicted Singh with illegally procuring a passport by failing to disclose his original asylum application in his subsequent applications. Indictment, R.3, PAGEID##4-5. By this point, Singh had lived in America for over twenty years, had been a U.S. citizen for nearly five, and was gainfully employed. Maintaining his citizenship was therefore

4

Singh's greatest priority. He hired another lawyer to represent him in the criminal proceedings. Singh Aff., R.25-2, PAGEID#184. Singh's lawyer presented a plea agreement and assured Singh that the agreement would protect his citizenship so long as Singh did not commit another crime. *Id.* The prosecutor also promised Singh that he would "not lose [his] citizenship unless [he] commit[ted] another crime." *Id.* Believing that his citizenship would be protected, Singh pled guilty. *Id.*

Nevertheless, the United States initiated denaturalization proceedings in the Eastern District of Kentucky on May 18, 2018. The denaturalization complaint hinges on Singh's passport-fraud conviction. Compl., R.1, PAGEID##1-2, *United States v. Singh*, No. 2:18-cv-85 (E.D. Ky. May 18, 2018). On top of providing the factual predicate for the government's denaturalization proceedings, Singh's passport-fraud conviction also made Singh subject to deportation following denaturalization. *See* 8 U.S.C. § 1227(a)(2)(A)(i)(II). Indeed, the denaturalization case is so dependent on Singh's criminal conviction that the denaturalization case has been stayed pending resolution of this case. Stay Order, R.91, PAGEID#425, *Singh*, No. 2:18-cv-85 (E.D. Ky. May 15, 2026).

5

Given the link between his conviction and the denaturalization proceedings, Singh petitioned the court of conviction for a writ of coram nobis setting aside his conviction. *United States v. Singh*, 95 F.4th 1028, 1031 (6th Cir. 2024). Singh argued that "he was deprived the effective assistance of counsel because his attorney erroneously told him the plea wouldn't affect his citizenship unless he committed another crime." *Id.* at 1033. The district court recognized that "the government's decision to attack Singh's citizenship appears to be at odds with the representations in the plea agreement" and agreed that Singh's attorney "[p]robably" should "have warned him that denaturalization proceedings" could be brought absent other criminal charges. *United States v. Singh*, 2022 WL 2209369, at *1, *6 (E.D. Mich. June 19, 2022). The district court nevertheless denied his petition, and this Court affirmed. *Singh*, 95 F.4th at 1031, 1035.

A few months later, the Second Circuit decided *Farhane*. The Second Circuit held that "under *Padilla*, a naturalized U.S. citizen has a Sixth Amendment right to be advised by counsel that he may be denaturalized and deported as a result of his entry of a guilty plea." 121 F.4th at 363. In light of *Farhane*, Singh moved for reconsideration of the district court's denial of his coram nobis petition. The district court denied his motion. Op. 3.

6

On appeal, the panel affirmed, holding that counsel need not inform a client that a guilty plea comes with a risk of denaturalization. The panel reasoned that denaturalization is a collateral consequence of a guilty plea that falls outside the *Strickland* framework. *Id.* at 4-6. The panel also concluded that the Supreme Court's decision in *Padilla*—which held that counsel must inform clients that a guilty plea risks deportation—did not control due to the differences between deportation and denaturalization. *Id.* at 6-10. In so doing, the panel expressly recognized that it was creating a split with the Second Circuit. *Id.* Judge Griffin concurred in judgment. *Id.* at 11-12.

## REASONS FOR GRANTING REHEARING

### I.   The Panel Decision Expressly Splits with the En Banc Second Circuit and Conflicts with Supreme Court Precedent

The panel decision expressly parts ways with the en banc Second Circuit over whether the Sixth Amendment requires counsel to inform naturalized citizens of the risk of denaturalization following a guilty plea. The panel decision also conflicts with Supreme Court precedent, including *Padilla*, which "controls this case." *Farhane*, 121 F.4th at 382 (Pérez, J., concurring) (capitalization omitted). This Court should grant en banc review, resolve the newly created circuit split, and correct the departure from Supreme Court precedent. *See* Fed. R. App. P. 40(b)(2)(B)-(C).

1.  The panel decision expressly "disagree[d]" with the en banc Second Circuit's decision in *Farhane*, Op. 9, creating a circuit split over whether the Sixth Amendment obligates counsel to inform naturalized defendants of the risk of denaturalization following a guilty plea.  The divergent outcomes stem from disagreements between the panel and the Second Circuit over two central issues: (i) the collateral-direct distinction and (ii) the role of *Padilla*.

*First*, the Sixth and Second Circuits are now at loggerheads over the application of the collateral-direct distinction to denaturalization.  The Sixth Amendment affords criminal defendants the "right to the 'effective assistance of competent counsel,'" including during the plea-bargaining process.  *Id.* at 4 (quoting *Lafler v. Cooper*, 566 U.S. 156, 162 (2012)).  Some courts, including the Second and Sixth Circuits, hold that defense counsel must therefore advise clients "of the direct consequences of any plea agreement," like a statutory maximum, but ordinarily need not inform clients of collateral consequences, like civil forfeiture.[1]  *Id.*  Even if the collateral-direct framework applies to

---

[1] The Supreme Court, "however, [has] never applied a distinction between direct and collateral consequences to define the scope of constitutionally 'reasonable professional assistance' required under *Strickland*."  *Padilla*, 559 U.S. at 365 (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)); *accord Miller v. Straub*, 299 F.3d 570, 579 (6th Cir. 2002).  As a result, in the wake of *Padilla*, some courts have rejected the collateral-direct distinction altogether.  *E.g.*, *Alexander v. State*, 772 S.E.2d 655, 659 (Ga. 2015).  The panel's

ineffective-assistance claims, *but see supra* n.1, there is a "notable exception," Op. 5.  When deportation is on the line, "[t]he collateral versus direct distinction is … ill suited to evaluating a *Strickland* claim," because deportation is a particularly severe penalty and a "nearly … automatic result" for many noncitizen offenders.  *Padilla*, 559 U.S. at 365-66.  As a result, "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel."  *Id.* at 366.

Notwithstanding the deportation exception, the panel here held that denaturalization is a collateral consequence of a guilty plea that requires no warning from counsel.  Op. 4-6.  Despite recognizing that denaturalization is a particularly "severe consequence[]," *id.* at 7 (citation omitted), the panel viewed denaturalization as distinct from deportation because it thought that denaturalization does not automatically follow from a guilty plea.  *Id.* at 4-8.  The panel pointed out that denaturalization:  (1) involves a separate, civil proceeding that can occur in a different jurisdiction; (2) turns on the government's discretionary decision to initiate such a proceeding; and (3) does not depend on a criminal conviction.  *Id.* at 6-8.  As a result, the panel concluded that the

---

decision to apply the collateral-direct distinction to dispose of Singh's *Strickland* claim conflicts with those courts as well.

9

collateral-direct distinction applied and foreclosed Singh's Sixth Amendment claim. *Id.* at 9.

The en banc Second Circuit, by contrast, held that denaturalization fits into the exception to the collateral-direct distinction that the Supreme Court carved out in *Padilla*.  The Second Circuit explained that "[f]or naturalized citizens who plead guilty to criminal conduct pre-dating their naturalization … their convictions create a nearly automatic risk of denaturalization." *Farhane*, 121 F.4th at 367 (cleaned up).  The court added that after the government initiates a denaturalization proceeding, deportation will inevitably follow—after all, the government does not "expend resources on civil denaturalization unless the ultimate goal is the removal of the defendant from the United States." *Id.* at 364 n.6 (citation omitted).  Moreover, a guilty plea has "collateral estoppel effect," making it "provably easier for the government to establish the facts necessary to denaturalize" a defendant. *Id.* at 365 (citation omitted).  And once those facts are established in a denaturalization proceeding, a court has "no discretion" to deny the government's requested relief. *Id.* (citation omitted).

The Second Circuit also rejected each of the bases on which the panel decision distinguished deportation from denaturalization.  Like denaturalization, deportation involves a separate proceeding, which is why it is "civil in

10

nature." *Id.* at 368 (quoting *Padilla*, 559 U.S. at 365); *see* 8 U.S.C. § 1229a. Like denaturalization, deportation depends on an "exercise of prosecutorial discretion … on a case-by-case basis." *Farhane*, 121 F.4th at 369 (quoting Mem. from Sec'y John Kelly, Dep't of Homeland Sec., *Enforcement of the Immigration Laws to Serve the National Interest* 4 (Feb. 20, 2017)). And like denaturalization, deportation does not depend on a criminal conviction—an alien can be removed from the country on myriad grounds. *Id.*

*Second*, the Sixth and Second Circuits now also disagree over the application of *Padilla*. The panel concluded that *Padilla* "took pains to limit its holding to advice about deportation," including by repeatedly referencing "noncitizens." Op. 6, 9. The panel also thought that *Padilla* was limited to situations where the risk of deportation was "virtually inevitable" as opposed to situations like denaturalization where there was a "risk" of deportation. *Id.* at 9-10 (citation omitted).

The Second Circuit, by contrast, determined that "a straightforward application of *Padilla* … resolve[d]" the case. *Farhane*, 121 F.4th at 363. The Second Circuit rejected the notion that *Padilla*'s holding is limited to noncitizens, since the Supreme Court stated its holding broadly: "[W]e now hold that counsel must inform her client whether his plea carries a risk of deportation."

11

*Padilla*, 559 U.S. at 374; *Farhane*, 121 F.4th at 370. Moreover, "*Padilla* did not limit its holding to cases in which deportation would certainly or immediately follow a criminal conviction" and instead repeatedly referred to the "risk" of deportation. *Farhane*, 121 F.4th at 368 (citing *Padilla*, 559 U.S. at 360, 366-67, 369, 370, 373-74). And, as the Second Circuit explained, "the risk of denaturalization simply *is* a risk of deportation." *Id.* at 364. The Second Circuit thus concluded that the same "risk" discussed in *Padilla* exists for criminal defendants who face denaturalization proceedings after their plea.

From top to bottom, the panel decision and *Farhane* are irreconcilable. The full Court should intervene to correct this newly created circuit split.

2. On top of splitting with the Second Circuit, the panel decision also runs headlong into Supreme Court precedent. Start with *Padilla*, which fully "answers the question before [the Court]." *Id.* *Padilla* "hold[s] that counsel must inform her client whether his plea carries a risk of deportation." 559 U.S. at 374. The panel decision—which holds that counsel need not inform naturalized citizens that pleading guilty carries a risk of denaturalization and therefore deportation—is flatly contrary to the Supreme Court's broad holding. On its terms, *Padilla*'s holding does not distinguish between aliens and naturalized citizens and requires counsel to inform clients of all stripes about the risk

12

of deportation following a plea.  If anything, *Padilla*'s warnings about the gravity of deportation apply with extra force to citizens like Singh, who reasonably expect that their adoptive country will remain their home notwithstanding a criminal conviction.  The panel decision thus inappropriately carved a gaping exception into *Padilla*, providing greater protection to noncitizens than to naturalized American citizens.

For the same reason, the panel decision also conflicts with *Chaidez*, a follow-on case to *Padilla*.  *See Chaidez v. United States*, 568 U.S. 342 (2013).  *Chaidez* construed and further clarified *Padilla*'s holding and did not impose the artificial limits that the panel grafted on here.  Rather, *Chaidez* explained that *Padilla* "made the *Strickland* test operative[] when a criminal lawyer gives (or fails to give) advice about immigration consequences."  *Id.* at 353; *accord id.* at 352 (*Padilla* held that the collateral-direct distinction "should not exempt from Sixth Amendment scrutiny a lawyer's advice (or non-advice) about a plea's deportation risk.").  *Chaidez* makes no mention of *Padilla* limiting its holding to noncitizens or to near-automatic deportations.  The panel decision erred in concluding otherwise.

Because the panel decision is out of step with Supreme Court precedent, the full Court should intercede to rectify the circuit's approach.

13

## II.    The Case Presents a Question of Exceptional Importance

The panel also made "a precedent-setting error of exceptional public importance," further supporting the necessity of en banc review.  6th Cir. I.O.P. 40(b)(1); *see also* Fed. R. App. P. 40(b)(2)(D).  The panel's holding portends dire consequences for Singh and all 26 million naturalized citizens.  *See* Holly Straut-Eppsteiner, *Naturalization: Policy Overview and Selected Trends*, Cong. Rsch. Serv. (Sept. 16, 2025), https://tinyurl.com/4m8h284z.  Denaturalization is a "'severe' consequence[]."  Op. 7 (quoting *Fedorenko v. United States*, 449 U.S. 490, 505 (1981)).  "[N]owhere in the world today is the right of citizenship of greater worth to an individual than it is in this country."  *Id.* (quoting *Schneiderman v. United States*, 320 U.S. 118, 122 (1943)).

And the risk of denaturalization is no longer an empty threat.  *Contra id.* (considering outdated statistics from 1968 to 2012).  The Department of Justice has been instructed to "prioritize and maximally pursue denaturalization proceedings."  Mem. from Brett A. Shumate, Assistant Att'y Gen., *Civil Division Enforcement Priorities* 4, U.S. Dep't of Justice, (June 11, 2025), https://tinyurl.com/4kbwpuc8.  As of April 2026, "[t]he Justice Department has identified 384 foreign-born Americans whose citizenship it wants to revoke."

14

Ernesto Londoño & Hamed Aleaziz, *Justice Dept. Targets Hundreds of Citizens in New Push for Denaturalization*, N.Y. Times (Apr. 23, 2026), https://tinyurl.com/s43n2k3u.  The panel's decision also affects children who gained citizenship derivatively from their naturalized parents—they, too, will lose their citizenship following their parents' post-conviction denaturalization even when their parents lacked adequate counsel in the criminal proceedings.  *See Klapprott*, 335 U.S. at 612 (opinion of Black, J.); 8 U.S.C. § 1451(d).  A broadly applicable rule affecting the rights of many future litigants—like the one adopted by the panel decision—presents a question of exceptional importance that warrants the full Court's intervention.  *See Bell v. Bell*, 512 F.3d 223, 231 nn.2, 6 (6th Cir. 2008) (en banc).

At bottom, it is the Court's "responsibility under the Constitution to ensure that no criminal defendant … is left to the mercies of incompetent counsel."  *Padilla*, 559 U.S. at 374 (citation omitted).  In line with this mandate, the Sixth Circuit has previously granted en banc review to decide Sixth Amendment questions.  *See, e.g.*, *United States v. White*, 551 F.3d 381, 382 (6th Cir. 2008) (en banc).  The Court should do the same here.

15

## CONCLUSION

The petition for rehearing en banc should be granted.

Respectfully submitted,

FIROOZ T. NAMEI
NAMEI & DALENCE LLC
   *15 East 8th Street*
   *Cincinnati, OH 45202*
   *(513) 721-0200*

LISA S. BLATT
   *Counsel of Record*
CHARLES L. MCCLOUD
ERIN M. SIELAFF
RHOCHELLE KRAWETZ
WILLIAMS & CONNOLLY LLP
   *680 Maine Avenue SW*
   *Washington, DC 20024*
   *(202) 434-5000*
   *lblatt@wc.com*

*Counsel for Defendant-Appellant Karnail Singh*

Dated:  June 2, 2026

16

## CERTIFICATE OF SERVICE

I hereby certify that, on June 2, 2026, I electronically filed the foregoing Petition for Rehearing En Banc with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system, which suffices as notice to all counsel of record.

/s/ Lisa S. Blatt
LISA S. BLATT
*Counsel for Defendant-Appellant*

Dated: June 2, 2026

# CERTIFICATE OF COMPLIANCE

I certify, under Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, that the attached Petition for Rehearing En Banc contains 3,150 words and complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface, using Microsoft Word, in 14-point CenturyExpd BT.

/s/ Lisa S. Blatt
LISA S. BLATT
*Counsel for Defendant-Appellant*

Dated: June 2, 2026

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0130p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

KARNAIL SINGH,

*Defendant-Appellant*.

No. 25-1523

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:13-cr-20551-1—David M. Lawson, District Judge.

Decided and Filed:  May 5, 2026

Before:  GRIFFIN, THAPAR, and NALBANDIAN, Circuit Judges.

───────────────

**COUNSEL**

**ON BRIEF:**  Firooz T. Namei, MCKINNEY & NAMEI CO., L.P.A., Cincinnati, Ohio, for Appellant.  Jessica V. Currie, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

THAPAR, J., delivered the opinion of the court in which NALBANDIAN, J., joined, and GRIFFIN, J., joined in the judgment.  GRIFFIN, J. (pp. 11–12), delivered a separate concurring opinion concurring in the judgment only.

───────────────

**OPINION**

───────────────

THAPAR, Circuit Judge.  Karnail Singh, a naturalized U.S. citizen, pled guilty to using a passport that he fraudulently obtained.  He now seeks to set aside that conviction, claiming he received ineffective assistance of counsel.  Singh argues that his attorney should have explained

that his guilty plea could lead to denaturalization.  But the Sixth Amendment doesn't require attorneys to advise naturalized citizens that a guilty plea may carry the risk of denaturalization and eventual deportation.  So we affirm.

I.

Karnail Singh, a native of India, illegally entered the United States decades ago and then applied for asylum.  The government denied that application and ordered him deported.  But that didn't deter Singh.  Instead of leaving the country, he submitted another asylum application listing a different name, birth date, place of birth, and parents.  None of this new information was true.

Singh then married an American citizen and applied for permanent-resident status, using the same false information listed on his second asylum application.  On that residency application, Singh claimed that he had never been denied an immigration benefit and had never provided false information on an immigration form before.  Of course, neither statement was true.  But based on these misrepresentations, the government granted Singh permanent-resident status.  A few years later, Singh became a naturalized U.S. citizen.

As a new citizen, Singh obtained a U.S. passport.  Following a trip abroad, he attempted to reenter the United States using that passport.  Officers at the border crossing asked Singh if he had ever used any other names or birth dates.  Singh replied that he hadn't.  But that, once again, wasn't true.  So the government charged him with using a fraudulently obtained passport and making a false statement to federal agents.

Singh eventually pled guilty to the fraudulent-passport charge, and the government agreed to dismiss the false-statement charge.  Singh's plea agreement warned that his guilty plea could "affect or even foreclose his eligibility to remain in this country."  R. 16, Pg. ID 43. Nevertheless, Singh agreed that his decision to plead guilty was "wholly independent of the immigration consequences."  *Id.* at 44.  Then, at the plea hearing, the district court explained that Singh's guilty plea could "be used if the immigration services bring a petition to cancel [his] citizenship."  R. 22, Pg. ID 127.  Singh confirmed that he understood and proceeded to plead guilty.  The district court ultimately sentenced Singh to 12 months' probation.

A few years later, the government began proceedings to denaturalize Singh. The government alleged that Singh illegally procured his citizenship because he wasn't lawfully admitted to the United States, committed fraud on his permanent-residency application, and made willful misrepresentations on his naturalization application. It also alleged that Singh lacked good moral character—and was thus ineligible for naturalization—because he made false statements in his citizenship application and interview. The government argued that the factual basis in Singh's guilty plea "substantiates his concealment and use of two identities throughout his immigration proceedings." R. 30-4, Pg. ID 267–68. So the government claimed that Singh couldn't "reasonably dispute his deceptive actions." *Id.* at 268.

Singh then petitioned for a writ of coram nobis before the district court. A coram nobis petition is used to challenge the validity of a conviction or sentence when a habeas petition isn't available. *Chaidez v. United States*, 568 U.S. 342, 345 n.1 (2013). Singh claimed that his conviction wasn't valid because he received ineffective assistance of counsel. According to Singh, his attorney incorrectly advised him that the plea agreement would "protect his citizenship—unless he commit[ted] another crime." R. 25, Pg. ID 148. The district court denied the petition. We affirmed because Singh hadn't established a reasonable probability that, but for his counsel's advice, he would have declined to plead guilty or negotiated a better deal. *United States v. Singh*, 95 F.4th 1028, 1033–34 (6th Cir.), *cert. denied*, 145 S. Ct. 167 (2024) (mem.). At that point, the case seemed to be over.

But a few months later, the Second Circuit, sitting en banc, decided *Farhane v. United States*. 121 F.4th 353 (2d Cir. 2024) (en banc). Over multiple dissents, it held that the Sixth Amendment requires defense attorneys to advise naturalized citizens of the risk of denaturalization and eventual deportation following a guilty plea. *Id.* at 358. So Singh moved for reconsideration of the district court's denial. The district court denied that motion, and Singh timely appealed.

## II.

This appeal presents a simple legal question:   Does the Sixth Amendment require a defense attorney to notify a naturalized citizen that a guilty plea may lead to denaturalization?[1] Singh argues that our court should follow the Second Circuit's decision in *Farhane* and conclude that the answer is yes.  But *Farhane* misapplied longstanding Supreme Court precedent.  Simply put, neither the Sixth Amendment nor Supreme Court precedent applying it requires attorneys to advise naturalized citizens that a guilty plea may carry the risk of denaturalization and eventual deportation.

## A.

The Sixth Amendment guarantees criminal defendants' right to the "effective assistance of competent counsel."  *Lafler v. Cooper*, 566 U.S 156, 162 (2012).  That right extends to the plea-bargaining process.  *Id.*  This means a defense attorney must advise his client of the direct consequences of any plea agreement, such as the maximum prison term that could be imposed. *Brady v. United States*, 397 U.S. 742, 755 (1970); *King v. Dutton*, 17 F.3d 151, 154 (6th Cir. 1994).  But a defense attorney isn't constitutionally required to inform his client of any collateral consequences stemming from the plea agreement.  *Chaidez*, 568 U.S. at 350–51.  A consequence is collateral if it "remains beyond the control and responsibility of the district court in which th[e] conviction was entered."  *Saylor v. Nagy*, No. 20-1834, 2021 WL 5356030, at *4 (6th Cir. Nov. 17, 2021) (quoting *El-Nobani v. United States*, 287 F.3d 417, 421 (6th Cir. 2002)). Examples include civil commitment, civil forfeiture, sex-offender registration, disqualification from public benefits, loss of the right to vote, ineligibility to possess firearms, loss of professional licenses, and discharge from the armed services.  *Chaidez*, 568 U.S. at 349 n.5; *see also Padilla v. Kentucky*, 559 U.S. 356, 376 (2010) (Alito, J., concurring in the judgment).  In

---

[1]The concurrence thoughtfully argues that we shouldn't address the Sixth Amendment issue because Singh's motion doesn't meet the standard for reconsideration.  Of course, we should avoid reaching constitutional questions unless necessary.  But here, Singh could be entitled to reconsideration if he identifies "a clear error of law."  *Gen. Motors, LLC v. FCA US, LLC*, 44 F.4th 548, 563 (6th Cir. 2022).  Singh urges us to agree with the Second Circuit that "a straightforward application of" existing Supreme Court precedent requires defense attorneys to tell their clients about the risk of denaturalization.  *Farhane*, 121 F.4th at 363.  If the Second Circuit were correct, the district court's failure to identify that rule would be a clear error of law that could entitle Singh to reconsideration.  So we must address the constitutional question to resolve this appeal.

short, defense attorneys must tell their clients about direct—but not collateral—consequences of a plea deal.

This distinction between direct and collateral consequences makes sense.

Start with the text of the Sixth Amendment. It guarantees an individual the right "to have the Assistance of Counsel for his defence" in "all criminal prosecutions." U.S. Const. amend. VI. So the right to counsel is limited to assistance with the accused's "defence" in a "criminal prosecution[]" and doesn't extend to advice about follow-on consequences or subsequent proceedings.

The direct-collateral distinction also accounts for the practical limitations on lawyers' skill and knowledge. Defense attorneys may know a lot about criminal law and procedure. But they aren't experts in other areas of the law. So it would be "unrealistic to expect them to provide expert advice on matters that lie outside their area of training and experience." *Padilla*, 559 U.S. at 376 (Alito, J., concurring in the judgment). Indeed, providing such advice comes with significant risks. For example, the advice might be wrong and could lead to a finding that the attorney was ineffective. Such a finding may then result in bar sanctions. *See Rodriguez-Penton v. United States*, 905 F.3d 481, 490 (6th Cir. 2018) (Thapar, J., dissenting). What's more, clients may be worse off because they may forgo seeking advice from a real expert in the field—in this case, an immigration lawyer.

For these reasons, state and lower federal courts "almost unanimously concluded" that the Sixth Amendment doesn't require an attorney to inform his client of a conviction's collateral consequences, making that "one of the most widely recognized rules of American law." *Chaidez*, 568 U.S. at 350–51 (quotation omitted).

The Supreme Court has created one notable exception to this rule. In *Padilla v. Kentucky*, the Court "breach[ed] the previously chink-free wall between direct and collateral consequences." *Chaidez*, 568 U.S. at 352–53. It held that a defense attorney must inform an alien that a guilty plea may carry a risk of deportation. *Padilla*, 559 U.S. at 359–60. That's because deportation is an especially "severe" consequence of a criminal conviction. *Id.* at 365. Plus, our immigration laws have increasingly linked convictions with a risk of deportation. *Id.* at

365–66.  In fact, deportation has become a nearly automatic result for many aliens who are convicted of crimes in this country.  *Id.* at 366.  That reality made it difficult for the Court to classify deportation as either a direct or collateral consequence.  *Id.*  So it introduced a narrow exception based on "the unique nature of deportation."  *Id.* at 365.  But the Court "did not eschew the direct-collateral divide across the board."  *Chaidez*, 568 U.S. at 355.  Outside of the deportation context, the direct-collateral divide continues to apply.

Applying that settled precedent to this case provides a straightforward answer:  Singh's counsel wasn't required to inform him of the risk of denaturalization.  Civil denaturalization is a separate proceeding that requires the government to file suit in the judicial district where the naturalized citizen resides.  *See* 8 U.S.C. § 1451(a).  And that new suit is "beyond the control and responsibility of the district court" in which the naturalized citizen was convicted.  *Saylor*, 2021 WL 5356030, at *4 (quotation omitted).  In this case, the conviction and denaturalization proceedings occurred in entirely different judicial districts.  Singh was convicted in the Eastern District of Michigan, and the government sought denaturalization in the Eastern District of Kentucky, where Singh resides.  But even if all this litigation occurred in the same district, denaturalization is still a new and separate civil proceeding unconnected to any prior criminal "defence."  U.S. Const. amend. VI.  So it's a quintessential collateral consequence that falls outside the Sixth Amendment's scope.

B.

Still, Singh urges us to adopt a new exception to the direct-collateral divide and hold that the Sixth Amendment requires defense attorneys to advise naturalized citizens of the risk of denaturalization.  Singh primarily hangs his hat on the Second Circuit's recent decision in *Farhane*.  According to the Second Circuit, a "straightforward application of *Padilla*" requires counsel to advise his client of the risk of denaturalization and eventual deportation.  *Farhane*, 121 F.4th at 363.  Not so.

The Second Circuit misread *Padilla* by extending its reasoning to denaturalization.  For starters, the *Padilla* Court took pains to limit its holding to advice about deportation, noting the "unique nature" of that penalty.  *Padilla*, 559 U.S. at 365–66; *see also United States v. Reeves*,

No. 25-1523                    *United States v. Singh*                    Page 7

695 F.3d 637, 640 (7th Cir. 2012) ("*Padilla* is rife with indications that the Supreme Court meant to limit its scope to the context of deportation only."). But the Second Circuit ignored those limitations and overlooked critical distinctions between deportation and denaturalization.

It's true that deportation and denaturalization share some similarities. Both are "severe" consequences. *Fedorenko v. United States*, 449 U.S. 490, 505 (1981). Indeed, for many people around the world, American citizenship is their "highest hope." *Schneiderman v. United States*, 320 U.S. 118, 122 (1943). After all, "nowhere in the world today is the right of citizenship of greater worth to an individual than it is in this country." *Id.* So losing that immense privilege can be "severe and unsettling." *Fedorenko*, 449 U.S. at 505. But many effects of a guilty plea, like losing the right to vote or being involuntarily committed to a mental institution, are also severe. And we still consider those severe consequences to be collateral. *Chaidez*, 568 U.S. at 349 n.5. So the severity of a consequence doesn't on its own implicate the Sixth Amendment.

Rather, the *Padilla* Court was concerned with *both* the severity of deportation *and* its close connection with a criminal conviction. As *Padilla* explained, deportation for an alien is a nearly automatic consequence of many criminal convictions. 559 U.S. at 366. But the same isn't true for denaturalization. That's because the government retains significant discretion over whether to institute separate denaturalization proceedings.[2] *See* 8 U.S.C. § 1451(a). Exercising that discretion, the government brought fewer than 150 denaturalization proceedings across the country from 1968 until 2012. Amber Qureshi, *The Denaturalization Consequences of Guilty Pleas*, 130 Yale L.J.F. 166, 170 (2020). In contrast, the government removed more than 68,000 aliens following a criminal conviction in 2024 alone. U.S. Immigr. & Customs Enf't, *Fiscal Year 2024 Annual Report* 32 (Dec. 19, 2024). These stark differences show just how rarely the government seeks denaturalization compared to deportation. But even if it sought denaturalization much more often, that wouldn't change the result. Simply put, denaturalization isn't an automatic consequence of a criminal conviction in the same way that deportation is.

---

[2]Our analysis in this case is limited to civil denaturalization under section 1451(a). In contrast, section 1451(e) makes denaturalization "an automatic consequence of a criminal conviction under 18 U.S.C. § 1425." *United States v. Maslenjak*, 821 F.3d 675, 682 (6th Cir. 2016), *vacated on other grounds by*, 582 U.S. 335 (2017). We express no view on whether the Sixth Amendment requires counsel to advise clients that pleading guilty to a violation of section 1425 will lead to automatic denaturalization.

What's more, denaturalization doesn't depend on whether the individual was convicted of a crime. It depends on whether he procured citizenship illegally, through concealment, or through willful misrepresentation. 8 U.S.C. § 1451(a). Citizenship is illegally procured if an individual fails to comply with all the requirements for citizenship that Congress has imposed—and many don't mention conviction. *Fedorenko*, 449 U.S. at 506. These requirements include being lawfully admitted to the United States, residing in the country for five years, and having "good moral character." 8 U.S.C. § 1427(a). An individual lacks good moral character if, for example, he gives false testimony to secure an immigration benefit. *Id.* § 1101(f)(6). The immigration regulations also include a catch-all category for any individual who "[c]ommitted unlawful acts that adversely reflect upon the applicant's moral character." 8 C.F.R. § 316.10(b)(3)(iii). These laws and regulations all have a common theme: Denaturalization typically depends on the individual's *conduct* leading up to or at the time of denaturalization, regardless of whether the individual was ultimately convicted for that conduct. So it's not as closely connected to a conviction as deportation.

The denaturalization proceeding against Singh provides the perfect example. The government alleged that he illegally procured naturalization because he engaged in fraud or made willful misrepresentations and wasn't lawfully admitted to the United States. It also alleged that he lacked good moral character because he had committed unlawful acts by lying on his naturalization form and because he gave false testimony under oath to immigration officials. All these allegations depend on Singh's conduct leading up to his naturalization. But notice what's missing: The government's denaturalization complaint didn't depend at all on whether Singh was *convicted* of a crime. In fact, Singh was eligible for denaturalization the moment he illegally procured citizenship, regardless of whether he ultimately pled guilty to federal crimes years later.

Now compare this to deportation. Under our immigration laws, being "convicted" of a wide range of criminal offenses makes an alien immediately "deportable." *E.g.*, 8 U.S.C. § 1227(a)(2)(A)(i) (crimes of moral turpitude); *id.* § 1227(a)(2)(A)(iii) (aggravated felonies), § 1227(a)(2)(B)(i) (offenses involving controlled substances); *id.* § 1227(a)(2)(C) (firearms offenses); *id.* § 1227(a)(2)(E)(i) (domestic-violence crimes, stalking, and child abuse). In other

words, the alien's unlawful conduct isn't enough for him to be deported under those statutes. Rather, the alien must be convicted of a crime for the government to proceed with deportation using those provisions. So deportation is "intimately related to the criminal process." *Padilla*, 559 U.S. at 365. The same can't be said for denaturalization.

Granted, a guilty plea may make denaturalization easier. When seeking denaturalization, the government carries a heavy burden and must offer "clear, unequivocal, and convincing" evidence. *Fedorenko*, 449 U.S. at 505 (quotation omitted). A defendant's previous guilty plea lightens this burden by preventing him from contesting the facts underlying that conviction. And those facts may subsequently be used to justify his denaturalization. *See Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 157 (1963). However, we've never held that counsel must inform a defendant that a guilty plea could be used against him in a future proceeding. In fact, we've said the opposite, noting that an attorney doesn't need to advise a defendant that a guilty plea could be introduced in a subsequent *criminal* prosecution. *King*, 17 F.3d at 153–54. If the Sixth Amendment doesn't require an attorney to notify a defendant that a guilty plea could be used against him in a future criminal prosecution with his liberty on the line, it certainly doesn't require an attorney to provide such a warning about a potential denaturalization proceeding.

In short, a criminal conviction isn't "enmeshed" with denaturalization like it is with deportation. *Padilla*, 559 U.S. at 365. So the rationale for requiring a defense attorney to advise his client of the risk of deportation following a guilty plea simply doesn't apply in the denaturalization context.

Perhaps recognizing these key distinctions, the *Farhane* court attempted to reframe *Padilla* as requiring an attorney to inform a defendant of "*any* risk" of deportation following a guilty plea. *Farhane*, 121 F.4th at 358 (emphasis added). Because denaturalization may eventually lead to deportation, the *Farhane* court reasoned that "[a] risk of denaturalization simply *is* a risk of deportation." *Id.* at 364. It thus concluded that *Padilla* requires an attorney to advise his client of the risk of denaturalization too. *Id.*

We disagree. For starters, *Padilla*'s repeated references to "noncitizens" make clear that its holding doesn't extend to denaturalization. *See, e.g.*, 559 U.S. at 363–66. And neither does

its logic.  As noted above, *Padilla* relied on both the severity of deportation *and* its close relationship with a criminal conviction.  So not just "any risk" of deportation suffices to implicate the Sixth Amendment.  Rather, deportation must be a nearly "automatic result."  *Id.* at 366.  But deportation can hardly be considered an automatic or "virtually inevitable" consequence of a naturalized citizen's conviction.  *Id.* at 360.  That's because deportation depends on the government's discretionary decision to first initiate denaturalization proceedings.  Plus, an individual facing denaturalization may be able to assert various defenses that aren't available to an alien who is convicted of a crime and facing deportation.  *See Farhane*, 121 F.4th at 391 (Walker, J., dissenting); *see also Kungys v. United States*, 485 U.S. 759, 780–81 (1988).  In short, deportation isn't an automatic consequence of a criminal conviction for naturalized citizens.  Thus, *Padilla* doesn't require counsel to advise a defendant of the remote and contingent possibility that he could be denaturalized and then eventually deported after pleading guilty.  The *Farhane* court therefore erred by trying to shoehorn denaturalization into *Padilla*'s holding.

*　　*　　*

In sum, counsel isn't required to advise a defendant that a guilty plea may carry a risk of denaturalization.  We affirm.

---

## CONCURRENCE

---

GRIFFIN, Circuit Judge, concurring in the judgment. I would not decide the Sixth Amendment question in the present case because doing so "offends the doctrine that constitutional questions that need not be addressed should be avoided." *Waters v. Churchill*, 511 U.S. 661, 689–90 (1994) (Scalia, J., concurring); *Moody v. NetChoice, LLC*, 603 U.S. 707, 757 (2024) (Thomas, J., concurring) ("When a federal court decides an issue unnecessary for resolving a case or controversy, the Judiciary assumes authority beyond what the Constitution granted."); *see also Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.").

Here, a narrower, nonconstitutional ground resolves this case: that the district court did not abuse its discretion in denying Singh's motion under Federal Rule of Civil Procedure 59(e). Although the majority's Sixth Amendment holding may be correct, I would affirm on the Rule 59(e) basis alone. Accordingly, I concur in the judgment only.

### I.

My affirmance would take the path advocated by the government. Singh moved for relief under Rule 59(e), invoking the Second Circuit's decision in *Farhane v. United States*, 121 F.4th 353 (2d Cir. 2024) (en banc), as the basis for relitigating his claim for ineffective assistance of counsel. The district court denied the motion. We are asked to decide whether the district court abused its discretion in doing so. It did not and, therefore, should be affirmed.

Rule 59(e) allows a court to alter or amend a judgment in narrow circumstances, including, relevant here, "an intervening change in controlling law," a "clear error of law," or "to prevent manifest injustice." *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999) (citation modified). None is present.

*Farhane* is not an intervening change in controlling law. Although it was issued after judgment had been entered against Singh, and is therefore intervening, a decision from the Second Circuit is not controlling in our circuit. *Cross Mountain Coal, Inc. v. Ward*, 93 F.3d 211, 217 (6th Cir. 1996).

Singh also has not "clearly establish[ed] a manifest error of law." *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998) (citation modified). Even if the district court's ruling on his Rule 59(e) motion contravened *Farhane*, a Second Circuit case, again, is not controlling. Thus, it was not a clear error of law for the district court not to follow *Farhane*'s holding.

Regarding manifest injustice, we have already held that Singh failed to show a reasonable probability that he would not have pleaded guilty had counsel advised him about any denaturalization consequences that might follow. *United States v. Singh*, 95 F.4th 1028, 1033–34 (6th Cir. 2024). He rehashes this argument now but with nothing new added. Thus, he once again fails to demonstrate prejudice, which is required to make out a successful claim of ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 697 (1984). There is no manifest injustice in disposing of an unsuccessful claim.

## II.

In short, a straightforward application of Rule 59(e) resolves this appeal. The majority, however, chooses to bypass a Rule 59(e) analysis and decide an important Sixth Amendment issue not argued by the government. Because the majority's disposition on constitutional grounds is not necessary, I concur in the judgment only.